UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHNNY CONTRERAS,<br><br>    Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>    Defendant. | Case No.: 1:13-cv-01237 - JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF JOHNNY CONTRERAS AND AGAINST DEFENDANT CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY |

    Plaintiff Johnny Contreras asserts he is entitled to benefits under Title II of the Social Security Act. Plaintiff argues the administrative law judge ("ALJ") erred in evaluating the evidence and seeks judicial review of the decision to deny his application for benefits pursuant to 42 U.S.C. § 405(g). Because the ALJ failed to set forth legally sufficient reasons for rejecting the credibility of Plaintiff's subjective complaints, as explained below, the action is **REMANDED** for further proceedings.

## BACKGROUND

    Plaintiff filed his application for benefits on July 16, 2010, alleging he became disabled on May 20, 2010. (Doc. 9-3 at 10.) The Social Security Administration denied his application initially and upon reconsideration. (Doc. 9-4 at 2-6.) After requesting a hearing, Plaintiff testified before the ALJ. (Doc. 9-3 at 38.) The ALJ determined Plaintiff was not disabled and issued an order denying benefits. (Doc. 9-3 at 14-25.) The Appeals Council denied plaintiff's request for review of the decision. (*Id.* at

2-4.) Thus, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The Court must uphold the ALJ's determination that the claimant is not disabled if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920 (a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927, 416.929.

**A.    Medical Evidence**

On March 4, 2007, Plaintiff visited an urgent care center, complaining of chest pain. (Doc. 9-8 at 3.) Following an EKG, Plaintiff "was transferred to the emergency room" at Bakersfield Memorial Hospital, where Plaintiff was diagnosed with an "acute inferior wall myocardial infarction." (*Id.*) In addition, Plaintiff was diagnosed with sleep apnea and "marked bradycardia with a heart rate in the 30s on a recurrent basis." (*Id.* at 15.) Plaintiff was then taken to the cardiac catheterization lab, where Dr. Kirit Desai performed an "[e]mergency left heart catheterization," a "[c]omplex multiple stent angioplasty of right coronary artery," and implanted a transvenous pacemaker. (*Id.* at 4-7.) Plaintiff was discharged from the hospital on March 8, 2007. (*Id.* at 12.)

Follow-up notes indicate that Plaintiff "had permanent pacemaker implantation," and denied having "any symptoms." (Doc. 9-8 at 18.) In April 2007, Plaintiff reported he was dieting and "walking almost two to three miles every day and feeling good." (*Id.*) Plaintiff stated that he wanted to return to work. (*Id.*) Dr. Desai informed Plaintiff that he could return to work on April 30, 2007, "without any restriction." (*Id.*)

In October 2007, Plaintiff had a six-month follow visit with Dr. Desai. (Doc. 9-8 at 21.) Plaintiff reported he was "feeling okay" and was walking "almost 14 miles a week." (*Id.*) Dr. Desai noted that the most recent analysis showed the pacemaker was functioning well. (*Id.*)

At the next visit in April 2008, Dr. Desai noted that Plaintiff reported "having a lot of pain in his back," "tingling and numbness in both the hands," and "pain in his left leg." (Doc. 9-8 at 23.)

Plaintiff continued to have visits with Dr. Desai approximately every six to nine months to check on the pacemaker and undergo a physical examination. (*See*, e.g, Doc. 9-8 at 23, 25.)

In December 2009, Plaintiff reported he had "difficulty with doing his work[1] which was making him weak and dizzy and also at times he was having chest pains." (Doc. 9-8 at 31.) Dr. Desai noted:

> The patient indicates that he is unable to operate a chain saw. Since John has a pacemaker he cannot operate it as it causes electromagnetic charge which might affect his pacemaker. Also the patient is unable to operate wheel loaders. While riding and operating [a] heavy loader, there is constant rocking and bouncing of the loader which causes . . . jarring of John's body with pacemaker causing him chest pain. The patient's job also requires weight lifting up to 50 pounds or greater, as he has to lift asphalt bags into the trucks and lifting drain box lids while performing maintenance drainage duties. During this it causes him to have chest pains and causes strain at the pacemaker site.

(*Id.*) Dr. Desai advised Plaintiff "to apply for permanent disability" because he was "unable to do the job he was hired to do." (*Id.* at 32.) However, Plaintiff continued to work. (*See* Doc. 9-8 at 35.)

On May 18, 2010, Plaintiff reported to the emergency room at Bakersfield Memorial Hospital. (Doc. 9-9 at 33.) Plaintiff explained that he lifted 350 pounds of material at work, after which he had chest pain and became diaphoretic. (Doc. 9-8 at 35; Doc. 9-9 at 33.) Plaintiff had an EKG with "essentially negative" results, and the physician opined that it appeared Plaintiff suffered "a pulled pectoral muscle/costochondritis." (Doc. 9-9 at 41.) At a follow-up visit on May 21, 2010, Dr. Desai again advised Plaintiff "to apply for disability" and told him "to obtain forms from [the] Social Security Office" to be completed by Dr. Desai. (Doc. 9-8 at 36.)

In July 2010, Dr. Desai noted Plaintiff reported "feeling okay," and had not applied for Social Security. (Doc. 9-8 at 37.) Plaintiff said "his supervisor had advised him that he should apply for work-related disability." (*Id.*) Dr. Desai explained Plaintiff's work "require[d] heavy exertional work in hot weather," which could "cause electrical or muscular interference on his pacemaker leads." (*Id.*) Given Plaintiff's coronary artery disease and pacemaker, Dr. Desai again "advised [Plaintiff] to apply for permanent disability." (*Id.*)

Dr. Desai completed a physical residual functional capacity questionnaire on October 6, 2010. (Doc. 9-9 at 53-56.) He noted that Plaintiff had atherosclerotic heart disease, with a guarded prognosis.

---

[1] Plaintiff's job was as a road maintenance worker. (Doc. 9-8 at 31)

4

(*Id.* at 53.) Plaintiff's chest pain could be "aggravated by lifting objects," and the "heart medications cause[d] fatigue" (*Id.*) Dr. Desai acknowledged there were no clinical findings or objective signs related to Plaintiff's impairment. (*Id.*) Dr. Desai believed Plaintiff was "[c]apable of low stress jobs," but opined pain would frequently interfere with Plaintiff's ability to sustain the attention and concentration required for even simple work. (*Id.* at 54.) According to Dr. Desai, Plaintiff was able to sit two hours at one time, stand for 30 minutes at one time, and required unscheduled breaks during an eight-hour day. (*Id.* at 54-55.) Dr. Desai believed Plaintiff could lift and carry less than ten pounds frequently, rarely lift and carry 20 pounds, and never lift 50 pounds; occasionally twist and stoop; and never climb ladders or stairs. (*Id.* at 55.) Also, Dr. Desai opined Plaintiff needed "to avoid extreme temperature, dust, fumes, [and] gases." (*Id.* at 56.)

Dr. Paul Frye completed a physical residual functional capacity assessment and case analysis on October 21, 2010. (Doc. 9-9 at 57-63.) Dr. Frye noted Plaintiff had coronary artery disease, and had a pacemaker and stent implanted. (*Id.* at 57.) He believed Plaintiff was able to lift and carry 10 pounds frequently and 20 pounds occasionally, stand and/or walk about six hours in an eight-hour day, and sit about six hours in an eight-hour day. (*Id.* at 58.) Dr. Frye found that Plaintiff could climb ramps and stairs frequently; but he could only occasionally climb ladders, ropes, or scaffolds. (*Id.* at 59.) Further, Dr. Frye believed Plaintiff should avoid concentrated exposure to extreme cold and heat, fumes, odors, dusts, gases, machinery, and vibrations. (*Id.* at 60.) According to Dr. Frye, the limitations assessed by Dr. Desai were based on Plaintiff's "current status, not projected," and were "overly restrictive considering minimal physical findings." (*Id.* at 61.) Dr. Frye believed Plaintiff "should be capable of full light [work]" by May 2011. (*Id.* at 63.)

On November 1, 2010, Plaintiff reported "having symptoms of light-headedness and dizziness but denie[d] any syncopal spell." (Doc. 9-9 at 65.) Dr. Desai recommended that Plaintiff "extend his disability for another six months and . . . apply for permanent disability." (*Id.*)

Dr. John Fahlberg completed a physical residual functional capacity assessment on March 11, 2011. (Doc. 9-9 at 88-95.) Dr. Fahlberg believed Plaintiff had stable coronary artery disease, and was currently able to lift and carry 10 pounds frequently and 20 pounds occasionally. (*Id.* at 88-89.) He opined Plaintiff was able to sit, stand, and/or walk about six hours in an eight-hour day; frequently

5

balance, stoop, kneel, crouch and crawl; and occasionally climb ladders, ropes, and scaffolds. (*Id.* at 89-90.) According to Dr. Fahlberg, Plaintiff was required to avoid concentrated exposure to vibration and hazards, but could have "unlimited" exposure to extreme cold, extreme heat, fumes, odors, gases, and dust. (*Id.* at 91.) Dr. Fahlberg explained that Plaintiff did not have atypical chest pain, and his stress test results were normal. (*Id.* at 89.) Dr. Fahlberg believed the medical record made it "clear" that Plaintiff had "[a] mild stable cardio condition and [was] limited from heavy work." (*Id.* at 94.)

On April 22, 2011, Plaintiff reported "persistent symptoms of light-headedness and dizziness and intermittent chest pain." (Doc. 9-10 at 6.) Dr. Desai ordered a Persantine thallium scan and echocardiographic examination, which yielded normal results.[2] (*Id.* at 4, 6.) In June 2011, Dr. Desai advised Plaintiff to "continue[] medical management." (*Id.* at 4.)

Dr. Desai completed a "Cardiac Residual Functional Capacity Questionnaire" on July 7, 2011. (Doc. 9-9 at 96-99.) Dr. Desai again indicated Plaintiff had atherosclerotic heart disease, and the diagnosis was supported by a "myocardial infarction, pacemaker implant, [and] stent implant." (*Id.* at 96.) Dr. Desai noted Plaintiff's symptoms included shortness of breath, fatigue, weakness, dizziness, and sweatiness. (*Id.*) Dr. Desai believed Plaintiff was no longer capable of low stress jobs, because his "[e]pidsodes of symptoms . . . have been stress related." (*Id.* at 97.) Dr. Desai believed Plaintiff was able to walk 2-3 blocks without severe pain; sit one hour at a time; stand for 30 minute at a time; and lift and carry less than 10 pounds occasionally, 10 pounds occasionally, and never 20 or more pounds. (*Id.* at 98.) Dr. Desai opined Plaintiff would require unscheduled breaks "possibl[y] several times a day," depending on his symptoms. (*Id.*) Further, Dr. Desai indicated Plaintiff needed to "avoid even moderate exposure" to extreme cold, extreme heat, and wetness; and should "avoid all exposure" to fumes, odors, dust, gases, and hazards. (*Id.* at 99.) According to Dr. Desai, Plaintiff's condition was stable, but "no improvement [was] expected." (*Id.* at 98.)

In August 2011, Dr. Desai advised Plaintiff "to continue current medical management." (Doc. 9-10 at 3.)

---

[2] At the administrative hearing, Dr. John Morse explained that the ejection fraction of 65 to 70 percent showed that "in spite of [the] previous heart attack in 2007, his heart function [was] normal." (Doc. 9-3 at 55.) Dr. Morse explained that Plaintiff had well-preserved left ventricular function, and there was "no evidence of congestive heart failure." (*Id.*) In addition, the negative Persantine test indicated there was "not any evidence of residual or ongoing ischemia which means blockages or insufficiency of blood supply." (*Id.*)

**B.     Administrative Hearing**

<u>1.     Plaintiff's Testimony</u>

Plaintiff testified that he suffered from a history of heart disease and chest pain, shortness of breath, pain in his lower back, lightheadedness, and difficultly sleeping and concentration. (*See* Doc. 9-3 at 43-44, 47-49.) Plaintiff reported he stopped working around May 2010 because he "was picking up stuff that was too heavy doing labor work." (*Id.* at 51.) He said he helped another person pick up a vibrator plate that "weighed about 300 pounds," and it caused him to have chest pains. (*Id.*) Plaintiff reported that after Plaintiff's chest pain, Dr. Desai "pulled [him] off of work." (*Id.* at 52.)

Plaintiff testified that he lived by himself, and was able to prepare his own meals such as soup and sandwiches. (Doc. 9-3 at 41.) He said he went to the grocery store, but "usually" had someone with him to "help . . . with the heavier items," including a gallon of milk or water. (*Id.* at 41-43.) He explained that lifting items could cause chest pain. (*Id.* at 43.) In addition, Plaintiff said he had chest pain when he woke up in the morning sometimes. (*Id.*)

He reported that he was able to walk "about a block, block-and-a-half" before he felt shortness of breath, started sweating, and cramps in his legs. (Doc. 9-3 at 44.) He said he had problems with his lower back, and was able to sit in a chair for about "10, 15 minutes" before he needed to move around. (*Id.* at 45.) Plaintiff testified that his niece sometimes took him to church, but he was not able to stay through the whole service, and would "usually leave before it's over." (*Id.* at 46.)

According to Plaintiff, he "lay around the house a lot" and slept during the day. (Doc. 9-3 at 47.) He explained that at night, he had problems sleeping and was unable to use a sleep machine. (*Id.* at 47, 65.) As a result, Plaintiff said he would like down for "[t]wenty or thirty minutes" at a time, "about four times a day." (*Id.* at 48.) He said he felt "lightheaded [and] tired" nearly every day, even if he tried to make his bed. (*Id.* at 49, 52.) Plaintiff testified that he reported his trouble sleeping to his physician, who did not want to prescribe more medication. (*Id.* at 49.)

<u>2.     Medical Expert's Testimony</u>

Dr. John Morse, a cardiologist, reviewed Plaintiff's medical record prior to testifying at the administrative hearing. (Doc. 9-3 at 54, 60.) Dr. Morse explained that Plaintiff's physical examinations showed there was "[n]o evidence of congestive heart failure." (*Id.* at 56.) Based upon his review of the

medical record, Dr. Morse opined Plaintiff had "a medically determinable illness mainly coronary artery disease [secondary] to an inferior myocardial infraction [sic] in 2007 which was interrupted by angioplasty with placement of a stint in the involved artery." (*Id.*) Dr. Morse found "no specific orthopedic data to support problems with his ankles, legs, [and] back." (*Id.* at 57.)

Dr. Morse believed the limitations assessed by Dr. Desai were "absolutely unsupported by the medical record." (Doc. 9-3 at 59.) Dr. Morse explained there was "no evidence of cardiac chest pain," and Plaintiff's "left-sided chest pain could be muscular skeletal, it could be anything." (*Id.*) According to Dr. Morse, Plaintiff could perform light work, which "would translate to lifting 20 pounds on an occasional basis, 10 pounds frequently." (Doc. 9-3 at 58.) Dr. Morse stated:

> [Plaintiff] should be able to stand and walk for six hours out of an eight-hour day. Sit for six hours out of an eight-hour day. And there'd be no additional push/pull limitations. A possibility he would be limited to frequent ramps and stairs. I don't have any specific contraindication to ladders, ropes or scaffolds. … He'd be limited to frequent balancing, stooping, kneeling, crouching, and crawling. There are no manipulative visual or communicative limitations. Environmentally I would probably limit him to avoid concentrated exposure to hazards, machinery, heights, et cetera. And I don't have any specific limitations to vibration so the only environmental limitations would be the hazard, hazardous machinery.

(*Id.*) In addition, Dr. Morse believed there was nothing to indicate that Plaintiff was required to elevate his legs during the day. (*Id.* at 59.)

He testified that Plaintiff's "cardiac medications should be well tolerated." (Doc. 9-3 at 67.) Dr. Morse explained "the cardiac medications [are] mainly beta blockers and ace inhibitors and things of that sort." (*Id.*) However, if Plaintiff was taking pain medicine or antipsychotics—which Dr. Morse did not know—the medicine "may have sedating affects." (*Id.* at 67-68.)

3.   Vocational Expert's Testimony

Linda Ferra, vocational expert ("VE"), characterized Plaintiff's past relevant work as a highway maintenance worker, which required medium exertion under the *Dictionary of Occupational Titles*[3], but "was heavy as performed." (Doc. 9-3 at 75.) The VE determined Plaintiff's prior jobs as a dump truck driver and hand packager also required medium exertion. (*Id.*)

---

[3] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy. *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

The ALJ asked the VE to consider a hypothetical individual who could "lift or carry occasionally 20 pounds, frequently zero to nine;" "[s]tand or walk less than two hours of an eight-hour workday;" and "[s]it less than two hours in an eight-hour workday, no more than two hours continuously." (Doc. 9-3 at 76-77.) The hypothetical worker "require[d] a sit/stand option" and "the ability to walk for ten minutes at a time every 45 minutes." (*Id.* at 77.) Further, the worker could occasionally twist, stoop, and crouch; never climb; and needed to avoid concentrated exposure to extreme temperatures, dust, gases, or fumes. (*Id.*) The VE opined that such a person was not able to perform Plaintiff's past relevant work. (*Id.*) At the very best, the hypothetical person could perform sedentary work. (*Id.* at 48.)

Next the VE considered an individual who was able to "lift or carry 20 pounds, frequently 10;" "[s]tand or walk about six hours of an eight-hour workday;" "[s]it about six hours of an eight-hour workday;" occasionally climb ladders; and frequently climb stairs, balance, stoop, crawl, crouch, and kneel. (Doc. 9-3 at 78.) In addition, the hypothetical worker was required to "[a]void concentrated exposure to extremes of heat or cold, vibration, fumes, odors, dust, gases, or poor ventilation," as well as "hazardous work environments." (*Id.*) The VE believed such a person could not perform Plaintiff's past relevant work. (*Id.*) However, the VE opined such a person could perform light and unskilled work such as assembler, *DOT* 712.787-010; packing line worker, *DOT* 753.687-038; and cashier, *DOT* 211.462-010. (*Id.* at 79-80.) With the additional limitation of "only work[ing] no more than four hours of standing or walking and four hours of sitting," the VE stated the individual would be limited to sedentary work. (Doc. 9-3 at 80.)

**C.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of May 20, 2010. (Doc. 9-3 at 19.) At step two, the ALJ found Plaintiff's severe impairments included: coronary artery disease, degenerative disc disease, sleep apnea, and hypertension. (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.* at 20.) Next, the ALJ determined Plaintiff had "the residual functional capacity to perform light work as defined by 20 CFR 404.1567(b) except occasionally climb ladders; frequently climb stairs, balance, stoop, crawl, and

9

kneel; avoid constant exposure to heat and cold; avoid vibration, fumes, odors, gases, poor ventilation, and hazardous environment." (*Id.* at 20.) Based upon this residual functional capacity, the ALJ concluded "there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform." (*Id.* at 24.) Consequently, the ALJ found Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 25.)

## DISCUSSION AND ANALYSIS

Plaintiff asserts the ALJ failed to give specific and legitimate reasons for rejecting the opinions of his treating physician and failed to give legally sufficient reasons for finding Plaintiff was not fully credible. (Doc. 15 at 5-12). On the other hand, Defendant argues that "the ALJ's weighing of the medical evidence is backed by substantial evidence," and the credibility determination was proper. (Doc. 19 at 20.)

**A.     The ALJ's evaluation of the medical evidence**

In this circuit, cases distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Generally, the opinion of a treating physician is afforded the greatest weight in disability cases, but it is not binding on an ALJ in determining the existence of an impairment or on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Also, an examining physician's opinion is given more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(2). Thus, the courts apply a hierarchy to the opinions offered by physicians.

A treating physician's opinion is not binding upon the ALJ, and may be rejected whether or not the opinion is contradicted by another. *Magallanes*, 881 F.2d at 751. When the opinion of a treating physician is not contradicted, an ALJ must set forth "clear and convincing" reasons to reject the opinion. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). An ALJ may reject the contradicted opinion of a physician with "specific and legitimate" reasons. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

If there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to

resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The Court must uphold the ALJ's resolution of the conflict when there is "more than one rational interpretation" of the evidence. *Id.*; *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

Here, the ALJ noted he gave "little weight" to the opinions of Dr. Desai dated October 6, 2010 "because they are not consistent with the medical record and progress notes at Exhibit 13F."[4] (Doc. 9-3 at 23.) Similarly, the ALJ gave "little weight" to the opinion offered by Dr. Desai on July 7, 2011 "because it is not consistent with [the] prior description of limitations, medical records, and progress notes at Exhibit 13F." (*Id.*) Because Drs. Frye, Fahlberg, and Morse contradicted these opinions, the ALJ was required to identify specific and legitimate reasons for rejecting the opinions. *See Lester*, 81 F.3d at 830. Plaintiff argues the ALJ failed to meet this burden. (Doc. 15 at 5-9.)

The Ninth Circuit has determined an ALJ may reject a medical opinion when it is inconsistent with the overall record. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999); *see also Batson v. Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1195 (9th Cir. 2003) (an ALJ may reject a physician's opinion when it is "unsupported by the record as a whole"). To reject an opinion as inconsistent with the medical record, the "ALJ must do more than offer his conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). The ALJ has a burden to "set[] out a *detailed and thorough summary of the facts and conflicting clinical evidence*, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1983) (emphasis added). Here, the ALJ has not explained how the opinions of Dr. Desai are inconsistent with the medical record and the progress notes. Rather, the ALJ has offered only his conclusions that the medical record contradicted the opinions. Therefore, the purported conflict with the medical record is not a specific, legitimate reason for rejecting the opinions of Dr. Desai.

Defendant argues the ALJ's analysis of the opinions was proper because Dr. Desai offered findings "inconsistent with … Dr. Desai's own treating records;" the opinions lacked the support of

---

[4] Exhibit 13F includes Hewitt Medical Group progress notes dated September 10, 2010 to July 8, 2011. (*See* Doc. 9-9 at 100-109.)

objective medical findings; Dr. Desai acted as an advocate for Plaintiff to apply for Social Security; and Dr. Desai offered his opinions "[o]n a check-the box form." (*See* Doc. 19 at 14-17.) Each of these reasons may be a specific, legitimate reason for giving less weight to the opinion of a treating physician. *See, e.g., See, e.g., Burkhart v. Bowen,* 856 F.2d 1335, 1339-40 (9th Cir.1988) (an ALJ may reject an opinion that is unsupported by medical findings); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (ALJ permissibly rejected treating physician's opinion containing contradictory observations); *Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992) (ALJ may reject medical opinion where doctor acts as an advocate in claimant's pursuit of benefits). Significantly, however, these reasons were not articulated by the ALJ in his explanation of the weight given to Dr. Desai's opinions.

The Court is constrained to review only the reasoning asserted by the ALJ, and cannot consider *post hoc* reasoning by Defendant, or even the evidence upon which the ALJ could have relied. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (noting that a reviewing court "is constrained to review the reasons the ALJ asserts" and finding error were the ALJ affirmed the ALJ's decision "based on evidence that the ALJ did not discuss"). The Ninth Circuit has explained that the Court cannot engage in "*post hoc* rationalizations that attempt to intuit what the [ALJ] might have been thinking," and cannot affirm on rationale that was not articulated by the ALJ. *Bray v. Comm'r*, 554 F.3d 1219, 1229 (9th Cir. 2009). Because the reasons identified by Defendant were not articulated by the ALJ, the Court cannot find the ALJ identified specific, legitimate reasons for rejecting the opinion of Dr. Desai.

**B.    Credibility of Plaintiff's Subjective Complaints**

In assessing credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Where the objective medical evidence shows an underlying impairment, and there is no affirmative evidence of a claimant's malingering, an "adverse credibility finding must be based on clear and convincing reasons." *Id.* at 1036; *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). Here, the ALJ determined Plaintiff's "medically-determinable impairments could reasonably be expected to cause the alleged symptoms." (Doc. 9-3 at

12

21). However, the ALJ found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not credible . . ." (*Id.*) Consequently, the ALJ was required to set forth clear and convincing reasons for rejecting Plaintiff's testimony regarding his limitations.

Factors that may be considered in the credibility analysis include: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct; (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). Here, the ALJ considered a number of factors, including his activities of daily living, the treatment Plaintiff received, and the medical record. (Doc. 9-3 at 23.) Plaintiff argues these reasons were legally insufficient to support a rejection of his testimony. (Doc. 15 at 10-12).

### 1. Activities of daily living

When a claimant spends a substantial part of the day "engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Fair*, 885 F.2d at 603). For example, a claimant's ability to cook, clean, do laundry and manage finances may be sufficient to support an adverse finding find of credibility. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *see also Burch v. Barchart,* 400 F.3d 676, 681 (9th Cir. 2005) (the claimant's activities "suggest she is quite functional. She is able to care for her own personal needs, cook, clean and shop. She interacts with her nephew and boyfriend. She is able to manage her own finances…"). Likewise, an ALJ may conclude "the severity of . . . limitations were exaggerated" when a claimant exercises, gardens, and participates in community activities. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009). However, an ALJ must make a specific finding relating to the transferability of the activities to a workplace to refute a plaintiff's allegations of disability. *Orn*, 495 F.3d at 639.

In this case, the ALJ considered Plaintiff's activities—including "making sandwiches, going to church, and going grocery shopping"—and concluded his activities were inconsistent with his

complaints of completely disabling pain. (Doc. 9-3 at 23). However, the Ninth Circuit has made clear that the mere fact a claimant engages in normal daily activities "does not in any way detract from [his] credibility as to [his] overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). The Court continued, "One does not need to be 'utterly incapacitated' in order to be disabled." *Id.* (quoting Fair, 885 F.2d at 603). Rather, an ALJ must make a determination as to whether daily activities are transferrable to a workplace. *See Orn*, 495 F.3d at 639 (the ALJ erred in failing to "meet the threshold for transferable work skills, the second ground for using daily activities in credibility determinations").

The ALJ failed to find Plaintiff's limited activities could be transferred to a work setting, or determine whether Plaintiff spent a "substantial" part of his day engaged in such activities. Moreover, the Ninth Circuit opined, "Daily household chores and grocery shopping are not activities that are easily transferable to a work environment." *Blau v. Astrue*, 263 Fed. App'x 635, 637 (9th Cir. 2008). Thus, Plaintiff's activities of daily living were not clear and convincing evidence to discount his credibility. *See Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (limited activities did not constitute convincing evidence that the claimant could function regularly in a work setting).

2. Treatment received

In assessing Plaintiff's credibility about his symptoms, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. § 404.1529(c). Further, the treatment Plaintiff received, especially when conservative, is a legitimate consideration in a credibility finding. *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged); *see also Burch*, 400 F.3d at 681 (finding the ALJ's consideration of the claimant's failure to see treatment for a three or four month period was "powerful evidence" and an "ALJ is permitted to consider lack of treatment in his credibility determination).

In this case, the ALJ observed Plaintiff's "treatment was conservative and non-aggressive." (Doc. 9-3 at 23.) Notably, in the past, Plaintiff had undergone surgery to install a pacemaker and a stent, and surgery is not considered conservative treatment. *See Ritchotte v. Astrue*, 281 Fed. Appx. 757, 759 (9th Cir. 2008) (rejecting the ALJ's conclusion that the claimant's treatment was too conservative where he had surgery and the prognosis was guarded); *see also Sanchez v. Colvin*, 2013

U.S. Dist. LEXIS 47081, at *10 (C.D. Cal. Mar. 29, 2013) ("surgery and conservative measures are at different ends of the treatment spectrum"). On the other hand, as the ALJ notes, Plaintiff received only conservative treatments following his alleged date of disability.[5] Thus, this factor may support the adverse credibility determination.

### 3. Inconsistencies with the medical record

The ALJ found Plaintiff's "testimony was not supported and inconsistent with object findings, and his complaints were inconsistent with signs and findings." (Doc. 9-3 at 23.) Generally, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine… credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch*, 400 F.3d at 681 ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis"). Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

Importantly, in citing to the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to make a simple statement that the testimony is inconsistent with the medical record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, the ALJ has a burden to "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Morgan*, 169 F.3d at 599; *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (the ALJ "must state which pain testimony is not credible and what evidence suggests the claimants are not credible"). Here, the ALJ failed to identify the portions of Plaintiff's testimony he believed were

---

[5] Notably, there was no evidence presented that more aggressive treatment was available to treat the symptoms Plaintiff claimed.

15

inconsistent with the medical record. Consequently, the objective medical record does not support the adverse credibility determination.

Moreover, the ALJ's failure to specifically discuss and identify what portions of Plaintiff's testimony he found not credible constituted a failure to apply the correct legal standards in evaluating the credibility of Plaintiff's testimony. As a result, the reasons for rejecting Plaintiff's credibility cannot be upheld by the Court. *See Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004) (an ALJ's credibility determinations may only be upheld when it is "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds").

## C. Remand is appropriate in this action

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the District Court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed when no useful purpose would be served by further administrative proceedings, or where the record has been fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Applying the *Smolen* factors to this case, the ALJ failed to set forth legally sufficient reasons to properly reject the opinions of Dr. Desai. The matter should be remanded for the ALJ to re-evaluate the medical evidence, because it is not clear from the record that the ALJ would be required to find Plaintiff disabled if the opinion of the treating physician was credited. Further, the ALJ failed to properly reject the credibility of Plaintiff's subjective complaints. A remand for further proceedings regarding the credibility determination is appropriate remedy. *See, e.g., Bunnell*, 947 F.2d at 348 (affirming the district court's order remanding for further proceedings where the ALJ failed to explain

with sufficient specificity the basis for rejecting the claimant's testimony); *Byrnes v. Shalala*, 60 F.3d 639, 642 (9th Cir. 1995) (remanding the case "for further proceedings evaluating the credibility of [the claimant's] subjective complaints . . ."). Based upon the record, remand is appropriate in this matter.

## **CONCLUSION AND ORDER**

For the reasons set forth above, the Court finds the ALJ erred in assessing the opinions of Plaintiff's treating cardiologist, and failed to identify clear and convincing reasons for rejecting the credibility of Plaintiff's subjective complaints. Because the ALJ failed to apply the correct legal standards, the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1. Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is **REMANDED** for further proceedings consistent with this decision; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Johnny Contreras and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **February 27, 2015**          /s/ Jennifer L. Thurston
                                                             UNITED STATES MAGISTRATE JUDGE